## SEXTON et al. *v.* McGILL.

The proof of loss which will authorize the introduction of inferior evidence, must depend on the particular circumstances of each case.

The oath of a subscribing witness, attesting the execution of a bond by which the obligor bound himself to make a good title to certain land, taken before the parish judge by whom the bond was recorded, is, *prima facie*, sufficient proof of its genuineness.

Where the subscribing witness to an instrument resides out of the State, the signature of the party by whom the act was executed may be proved by other witnessess.

The return of the sheriff on a subpoena taken out for a subscribing witness to an instrument, that, after diligent search and enquiry, no person of that name could be found in the parish, is not sufficient to authorize proof of the signature of the party by whom the act was executed. *Per Curiam:* The degree of diligence to be used in the search for subscribing witnesses to private acts is the same as that required in the search for a lost paper. It must be a strict, diligent and honest enquiry and search.

Plaintiffs' ancestor having acquired, during marriage, a warrant authorizing the holder to enter a certain quantity of public lands previously offered for sale, located it, after the death of his wife, on a part of the public domain which he occupied with his family, and on other adjoining lands, which had not been offered for sale until after her death. Under a pre-emption right acquired by a settlement commenced during the community, and continued after its dissolution, he purchased another portion; and other land was purchased by him after the dissolution of the marriage, under a settlement right of a third person, also acquired by him during the marriage. In an action by the heirs of the wife, against the defendants claiming under a purchase made from plaintiffs' ancestor after the dissolution of the community, the purchase being considered to have been made without notice; *Held*, that the title to the lands never vested in the community, and that whatever equitable claim plaintiffs may have against their father, the title of the defendant is unaffected by it. *Per Curiam:* Purchasers, without notice, cannot be disturbed by reason of frauds committed by their vendors, unless their participation in them be proved.

APPEAL from the District Court of Concordia, *Wilson*, J. Plaintiffs' father purchased during marriage, a government warrant issued in favor of one *Le Page*, authorizing the holder to enter any 320 acres of public domain previously offered for sale. This warrant was located by him on a portion of the

public domain which he had occupied with his family, and on other adjoining
land, but which was not offered for sale till after the death of his wife. Under
a right of pre-emption acquired by a settlement commenced during the com-
munity and continued after its dissolution, he purchased another portion of the
public land; and a third portion was purchased by him, after the dissolution of
the community, under a settlement right of a third person, also acquired by him
during marriage. The plaintiffs' claim, as heirs of their mother, one undivided
half of the lands, on the ground that the warrants and settlement rights belonged
to the community, and that the purchase by their father inured to the benefit
of the community. The defendants claim by purchase by their ancestor from
plainitffs' father, and there was a judgment below in their favor, from which the
plaintiffs appealed.

The defendants having offered in evidence a copy of a bond, signed by plain-
tiffs' ancestor, by which he bound himself to make them a valid title to the
lands in contest, the following bill of exceptions was taken to the opinion of the
court, admitting it:

"Be it remembered that, on the trial of this cause, the defendants, by their
counsel, offered in evidence, to prove the existence, loss, and contents of a cer-
tain title bond or deed, declared upon by them as title, a record contained in
book E, pp. 452–3, in parish judge's office, Concordia, purporting to be a copy
on record of said title bond or deed, with the oath of a subscribing witness
showing its execution, and the certificate of the parish judge attesting the re-
cord: also the testimony of judge Guion to verify the said record, and to prove
the existence of said original instrument, and contents of same; and the testi-
mony of McCall, agent of the defendants, that he had made diligent search for
the original, without success: also the testimony of Sparrow and Copley, that
diligent search had been made at the land office at Ouachita and at Washington
city, without success, for said instrument. Also proof that the loss of said
instrument had been advertised during the year 1842, in the manner required
by law: and upon this testimony they offered the said record as secondary evi-
dence of the contents of said instrument, which evidence contained in said re-
cord plaintiffs, by their counsel, objected to, on the ground that the existence
and loss of said instrument were not sufficiently shown; that the loss should
have been shown by the affidavit of the defendants; that the genuineness of the
original instrument recorded was not shown; that the record of the same was
illegally made, not having been proved by acknowledgement of the party, nor
by the oath of a subscribing witness before a notary and two witnesses, and the
said acknowledgement or proof recorded with the instrument as required by
law; and that the testimony of judge Guion going to establish said original and
said record was inadmissible, so far as his impressions were given, and so far as
they went to establish by parol the correctness of said record:—all of which ob-
jections the court overruled, and admitted the said secondary evidence of said
title bond or bill of sale. *By the Court:* It was proved that search was made
diligently in the parish judge's office, at Vidalia, for said paper, and that
written notice was served on the counsel of the plaintiffs to produce it."

The condition of the bond signed by plaintiffs' ancestor is in these words:

"The condition of the above obligation is such that, whereas the said *Daniel
Sexton* hath this day bargained and sold to said *James McGill*, all and singular
the tracts, or parcels, or body of land, claimed by him, and lying and being on
lake Bruin, in the parish of Concordia, State of Louisiana, about forty miles

<div style="float:left">SEXTON<br>*v.*<br>McGILL.</div>

above the town of Vidalia, supposed to contain in the entirety, seven hundred and eighty acres, be the same more or less, for and in consideration of the sum of $5,500 : now, if the said *Sexton* shall make to said *McGill*, a good and sufficient deed or deeds for said body of land, so soon as he shall get his title thereto derived from the government, completed by patent, &c., the said deed or deeds to be with warranty, general against all persons whatever, then the above obligation to be void; else to remain in full force.

<div style="text-align:right">DANIEL SEXTON. [Seal]</div>

Witness, T. T. GRAYSON."

J. *Dunlap* and T. P. *Farrar*, for the appellants. The copy of the bond was improperly admitted as evidence : First, because it is but the *copy of a copy* of a private act, the absence of the original not being accounted for. Secondly, because the *execution* of the original was never duly *proven*, and the record of the same was *illegal*. C. C. 2250, 2242. 8 Mart. N. S. 565 and 140. 3 La. 419. 11 Mart. 243. 3 Mart. N. S. 396. If the document was properly received, still it is not evidence of a sale, because: first, there is no description of the thing sold ; second, it was never accepted by the vendee. C. C. 2414, 1794, 1759, 1804. 4 Mart. N. S. 261. If it be evidence of a sale, it conveyed only the undivided half of the lands belonging to the community. No evidence was offered to show that the vendor *claimed* the whole of the lands in dispute, nor what lands he did claim ; and therefore the law presumes that the sale was limited to his legal interest in said lands, which was one-half. The decision in 7 La. p. 230, is conclusive as to this point.

The endorsement on the land receipts is no evidence of a sale, for want of acceptance and of a fixed price. 4 Mart. N. S. 263. Nor of a ratification of any previous sale. C. C. 2252. 1 Rob. 457-59. 11 Mart. 612. 17 La. 293. Story's Equity, 307. Whatever right *Sexton* acquired during the marriage, either in or to the land, one-half vested in his wife's heirs on the dissolution of the community. Civil Code, art. 2371 and 2374. Merlin's Rép. *verbo* Communauté, § v. Gomez; Ad leges Tauri, 57 *in notis*. Neither the act of 1810 nor that of 1813, nor the Code, require that the title of the wife in community property should be recorded, to give it effect as to third persons. In relation to the title of wives, the rule of *Caveat emptor* applies.

H. A. *Bullard*, on the same side. The husband acquired, during the existence of the community, a warrant which authorized him to locate three hundred and twenty acres of public land, or to give it in payment of land at two dollars per acre. He acquired from Johnson a right to an improvement, which was made before the pre-emption law of 1814. The family resided on the land during the life time of the wife, and valuable improvements were made. After her death the warrant was located on the same land, and a small fraction besides, was purchased for cash. The rest of the land was acquired in virtue of the pre-emption which existed at the death of *Mrs. Sexton.*

We contend that these rights, not certainly *in* the land, but *to it—jus ad rem*, acquired and improved by the community, belonged to the community the moment they were acquired; and that these *rights*, which are essentially property, became irrevocably vested, on the dissolution of the community, in the spouses, each for one undivided half. That rights of this kind constitute property (biens) cannot be doubted. They are appreciable in money. They were acquired out of the means of the community, and the lands afterwards acquired in consummation of these equitable titles was improved by the collaboration of the parties. The husband, after his wife's death, had no right to dispose of more than his half; and, in perfecting his title by locating the warrant and entering the preemption, he must be regarded as having acted for the heirs of his wife, as a trustee or negotiorum gestor. See the case in 7 La.

The Code (article 2371) enumerates the property which composes the acquests and gains of the community. It consists of the produce of the reciprocal industry and labor of the parties—of the estates (les biens, in the French text) acquired during the marriage, except by donation or inheritance. Article 2374, which declares that all the property or effects possessed by the parties at the dissolution of the marriage, are presumed to belong to the community, establishes only a rule of evidence, throwing upon the party who claims a part of such

property, as exclusively his, the burden of showing it.  But the moment pro-
perty is acquired, it becomes common property.

Gomez, in treating on the 72d law of Toro, says: "Item confirmatur, quia in
bonis superlucratis et acquisitis constante matrimonio *ipso jure* transit dominium
et possessio in uxorem pro medietate," &c.   Ad Leges Tauri, page 689, sec. 2,
in notis.   Hence the very next text of the law of Toro, saves from confiscation
the share of the wife, on the conviction of her husband of a crime followed by a
confiscation of his property.   The same law exists in France.   Merlin's Rép. de
Jurisp., verbo Communauté, sec. v.   The property is vested at once in such a
manner, that the right of the wife cannot be defeated by a fraudulent alienation,
during the marriage.

But the warrant was a real right—a right to appropriate to the exclusive use
of the holder, a portion of the domain.    It was an equitable right to three hun-
dred and twenty acres of land.     It was a right to the thing on the fulfilment of a
single condition, and although it conferred no exclusive title to the particular
tract, it was an equitable right, binding on the government, and would have en-
titled the holder to take the whole domain, if it had consisted of only three hun-
dred and twenty acres.    The entry of it at the land office was nothing more
than giving to that right a more definite character, a kind of *assiette*.   The land
officers had no discretion in the matter.   The pre-emption right was still incom-
plete.   The settlement and cultivation of *Sexton's* vendor authorized him to en-
ter and purchase the specific tract occupied and improved by him.   Both, then,
were equitable rights to land, and the legal title is still in the government, unless
patents have issued, which is not shown.

The question then arises, could the husband, acting after his wife's death, in
taking in his own name a certificate of purchase and consummation of these
equitable titles belonging to the community, make the property his own, and
he confer on his vendee a valid title for more than one-half.   I will believe, con-
ceded, that if he had done so before the death of his wife, the land itself would
have belonged to the community.   There can be no doubt on that point, but
it appears plain, that the title would have been to every essential purpose the
same acquired during the marriage, by the purchase of the land warrant and the
pre-emption right.   Nothing else had been done than to obtain from the govern-
ment a recognition of these primitive titles and the completion of the inchoate
right.

But it is said the defendant had no notice of these rights and of the title in the
community.   In the first place, I answer, that he knew that *Sexton* and his wife
lived on the land, and cultivated and improved it; and, secondly, that no law re-
quires that the title of the wife should be recorded.    If the husband dispose,
during marriage, of property in fraud of his wife's rights, there is no doubt she
can recover the specific property thus fraudulently alienated, even in the hands
of third persons, although the original purchase was made in the name of the
husband alone.   In the case of *Hennen* v. *Caldwell*, your predecessors held, that
acts under private signature by the husband during the marriage, conclude the
wife.   He is considered as acting for her.   No statute requires that her right
and title should be made known by registry, any more than her legal mortgage.
I refer the court to the statutes of 1810 and 1813.    See B. & C.'s Digest, 596.
The law has provided no means for giving publicity to such rights or titles of the
wife, and yet they undoubtedly exist, or else they could not be the object of a
fraudulent disposition.    It follows, therefore, that like tacit mortgages, the pur-
chaser runs the risk of them, if he deals with a man in such a situation in life as
to expose his property to such secret encumbrances, and acquires no greater
right than his vendor had.   The husband was, in relation to the heirs of his wife,
being their self-constituted agent, a negotiorum gestor, in making the entry at
the land office.   That act consummated the title, and it is a well settled doc-
trine, that the principal may, in all cases, identify and trace his property, and
claim its restoration; and if the question were between the plaintiffs and their
father, their right to one-half the land appears to me self-evident.   He could not
gain at their expense—he could not divest them of a right and invest it in
himself.

It is with these views of the rights of the parties originally, that the court
ought to put a construction on the conveyance made by *Sexton* to *McGill*.   It
will appear that he does not sell a specific quantity of land, but only *all his* land on
lake Bruin.   The deed ought to be construed as the will of *Theall* was, in the
case referred to in argument.   He should be considered as having sold only one-

half, which alone *was his*, leaving the defendant his recourse and warranty on his vendor. if it should appear from the acts of the parties that, as between themselves, the intention was to sell the whole land.

*Stacy* and *Sparrow*, for the defendants.    At the death of *Ann Sexton*, the community had no title to any specific land by virtue of the land warrant.   Acts of Congress of 1807, p. 107, vol. 4th, U. S. Laws.   7 Wheaton's Rep. *Hoofnagle* v. *Anderson*, p. 217.   It was simply an incorporeal right, subject to be exercised at some future time.   It was either real. or personal.   If personal, the vesting it in lands gave the heirs no title to those lands, even as against *Sexton*, any more than if it had been money of the community which *Sexton* had appropriated to the purchase.   If real, *Sexton* had no right to alienate the share of the minors, without the intervention of justice, nor to acquire lands by purchase for said minors.    Civil Code, arts. 334, 333, 337, 338.    6 Mart. N. S. p. 21.   If these heirs now ratify the purchase of the land by their father, they are bound also to ratify the alienation of it made by him (Civil Code, arts. 1786, 1788 1789,) and to look to him alone for their part of the price.                      ,

Admitting that *Sexton* entered the lands by virtue ot pre-emption rights acquired by him during the existence of the marriage, the community had no title to the land.   The law was nothing but a pollicitation on the part of the government, unaccepted at the death of *Mrs. Sexton*.)  Civil Code, arts. 2414, 1794.  *Milligan's Heirs* v. *Hargrove*, 6 Mart. N. S. p. 341.   7 Wheaton, p. 217.   The husband had no right after the death of his wife, to accept it so as to bind her heirs. If they now accept the purchase, they can do it only by ratifying the sale he made.

*Sexton* was the head and master of the community.   Civil Code, art. 2373. As such, he could accept or reject the proposition of the government.   The community ceased to exist with this pollicitation unaccepted, and with no right acquired to it.   7 La. pp. 222, 224.   Civil Code, art. 1804.

There is no evidence that the defendant, *McGill*, under whom defendants claim, knew that this land was entered by virtue of a pre-emption right and land warrant; or, if he knew this, that he knew that those incipient rights had been acquired by *Sexton* before the death of his wife, which took place nearly six years before *Sexton* entered the land.   This knowledge is not to be presumed in him, for bad faith is never presumed.    10 Mart. p. 439.   15 Peters, 104.    *McGill* then being a purchaser in good faith and of a person having the only legal title to the property, cannot be affected either by the previous fraud of *Sexton*, or the equitable rights of his children to the land.   6 Cranch's Rep. p. 133.    *Fletcher* v. *Peck*, 8 Mart. N. S. p. 342.    *Thomas* v. *Mead*, Ibid. p. 227.   9 La. pp. 288, 298.   13 La. 130.   11 La. 407.   10 Johnson, p. 196.   Ibid. 14, 415.

The judgment of the court was pronounced by         ‛

Rost, J.   The plaintiffs claim one undivided half of several adjoining tracts of land, under the following circumstances : Their father acquired during marriage, a warrant, issued in favor of one of the companions of *Lewis* and *Clarke*, which authorized him to locate three hundred and twenty acres of public land previously offered for sale by government, or to give it in payment of public lands at the rate of two dollars per acre.   He occupied at the time, with his family, a portion of the public domain, which was not offered for sale till after the death of his wife.   When he was authorized to do so, he acquired a portion of those lands, and others adjoining them, with the warrant.   Under the settlement commenced during the community and continued after its dissolution, he purchased another portion; the remainder was purchased under the settlement right of another person, also acquired by him pending marriage.

The plaintiffs allege that the defendants are in possession of the lands without title, and claim one undivided half of them, on the following grounds : 1st, That the warrant and settlement rights belonged to the community existing between their father and mother.   2d, That the purchases made by their father after its dissolution, should inure to their benefit, for one undivided half.   3d, That the document on which the defendants claim title, if proved, purports to be a promise

<div align="right">Sexton<br>*v.*<br>McGill.</div>

of their father, to sell all his lands on lake Bruin, and must be understood as conveying only the land he had; that is to say, one undivided half of the whole.

The defendants set up title by purchase from *Daniel Sexton* by their ancestor, and want of notice. The case was tried in the first instance, before a jury, whose finding was in favor of the defendants, and the plaintiffs have appealed from the judgment rendered on the verdict.

The defendants offered certain evidence to prove the existence, loss and contents of the title under which they claim, to the introduction of which the plaintiffs' counsel excepted, on the ground that the existence and loss of the instrument was not sufficiently shown; that the evidence adduced was not supported by the oath of the party; that the genuineness of the original act was not proven, and that it had not been properly recorded.

There is no error in the decision of the court below overruling those exceptions. The original was recorded as required by art. 2250 of the Civil Code, in order to have effect against third persons; and the sworn declaration of the subscribing witness establishes, *prima facie*, its genuineness. The defendants are the widow and minor heirs of the original purchaser, and as it has not been shown that the title was ever in their possession, they cannot be required to swear that they lost it. The evidence of the loss satisfied the court and jury, and, in our opinion, justified the introduction of the secondary evidence adduced by the defendants. The proof of loss which will authorize the introduction of inferior evidence, must depend on the particular circumstances of each case. 7 Mart. N. S. p. 548.

The title, of which the record is offered, is a promise of *Daniel Sexton*, to sell to the defendants' ancestor, for the sum of $5,500, all his lands on lake Bruin, supposed to contain, in the whole, seven hundred and eighty acres, under the penalty of $10,000. It is supported by an assignment to the purchaser, for value received, of the receipts given by the receiver of the land office to *Sexton*, for the price of all the lands purchased by him, and also by delivery of the land at the time, and actual possession ever since by the purchaser and his heirs.

The plaintiffs excepted to the introduction, in evidence, of the receipts of the land office and of the transfer of *Sexton*, on the ground that the subscribing witness should have been produced, or at least an attempt made to procure his testimony. It is proved that this witness resides out of the State, and, under the uniform practice of our courts, the signature of *Daniel Sexton* was properly proved by other witnesses.

Two other documents were also offered in evidence, to prove circumstances tending to corroborate the sale. The plaintiffs excepted to their introduction, on the ground that it was not shown that the subscribing witnesses were either dead or absent, and that they alone were competent to prove the signature of *Daniel Sexton*. It appears that subpœnas were taken out for those witnesses, upon which the sheriff made return that, after diligent search and inquiry, there were no persons of that name to be found in the parish. ·The court erred in suffering the signature to be proved by other witnesses, under that showing. The degree of diligence in the search for subscribing witnesses to private acts, is the same which is required in the search for a lost paper; it must be a strict, diligent and honest inquiry and search, 1 Greenleaf's Evid. p. 574.

The sheriff's return of *non est inventus*, on the *subpœna*, is not, by itself, a compliance with the rule.

SEXTON
*v.*
McGILL.

But disregarding this evidence, there is no reason to doubt the reality of the transfer and the good faith of the purchaser. We consider that the defendants have made out their allegation, that their ancestor was a purchaser without notice: and this court has repeatedly decided, that such purchasers cannot be disturbed, by reason of frauds committed by their vendors, unless their participation in them is proved. In the case of *Tippet and others* v. *Everson*, which does not materially differ from the present, judge Mathews, a high authority in questions involving equitable considerations, said: "Whether this court would interfere to enforce the inchoate rights of settlers on the domain of the United States, and to determine on the preference which is to be given to one or the other of two individuals contending for a right of pre-emption, while the contest remains between the original settlers, is unnecessary to determine. The defendant is an innocent purchaser, without notice of the claim of the plaintiffs, and ought not to be disturbed in his property and possession, *on so vague and uncertain a title.*" 8 Mart. p. 719.

We concur in these views. The land in this case was not purchased till after the dissolution of the community. That acquired with the warrant could not have been purchased during its continuance, because it had not been offered for sale. The title to the land never vested in the community, and whatever equitable claim the plaintiffs may have against their father, the title of the defendants is unaffected by it. *Judgment affirmed.*